**LAZY MOUNTAIN LAND CLUB,**
Appellant and Cross–Appellee,

v.

**MATANUSKA–SUSITNA BOROUGH BOARD OF ADJUSTMENT AND APPEALS, Appellee and Cross–Appellant.**

Nos. S–5713/5714.

Supreme Court of Alaska.

Sept. 1, 1995.

Rehearing Denied Oct. 27, 1995.

Charles E. Tulin, Anchorage, for Appellant/Cross–Appellee.

Michael Gatti, Matanuska–Susitna Borough Attorney, Palmer, for Appellee/Cross–Appellant.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

RABINOWITZ, Justice.

Lazy Mountain Land Club (LMLC), a limited partnership, appeals the denial of a conditional use permit by the Matanuska–Susitna Board of Adjustment and Appeals. LMLC argues that MSB 17.60, the borough zoning ordinance requiring the permit, is invalid because it was not adopted "in accordance with" or "in order to implement" a validly enacted comprehensive plan as required by AS 29.40.040. Alternatively, LMLC argues both that MSB 17.60 is unconstitutionally vague, and that by its own terms it is not applicable to LMLC's proposed land use.

## I. FACTS & PROCEEDINGS

Lazy Mountain Land Club owns a 16.9 acre tract of land near the intersection of the Parks Highway and Hyer Road.[1] This tract is located in the Twinook subdivision of the Matanuska–Susitna Borough (Mat–Su or Borough).

LMLC intends to operate the land as a private commercial refuse area doing business as the Dead Building Cemetery. The facility would function primarily as a disposal site for construction and demolition wastes. According to LMLC, the site was chosen because of its proximity to Anchorage as well as to numerous gravel pits and other sources of construction materials. With a low enough tipping fee it would be an economically viable disposal site for demolition waste from buildings which had been torn down in Anchorage. On their return trip "[t]rucks bringing debris to the new burial site could back-haul sand and gravel to the profitable Anchorage market."

In July 1989, LMLC applied to the Alaska Department of Environmental Conservation (DEC) for the necessary solid waste disposal

---

1. The official designation of this tract of land is Tract A, Twinook Subdivision 69–136, Section 17, T17N, R1E, Seward Meridian, Alaska.

permit.[2] A permit was issued by DEC on June 28, 1990.

LMLC also applied to the Mat–Su Planning Commission for a conditional use permit. Mat–Su Borough Code (MSB) 17.60.030 (1990) states that a conditional use permit is required for land uses which are "potentially damaging to the property values and usefulness of adjacent properties and/or potentially harmful to the public health, safety and welfare." The only enumerated land uses for which a permit is required under this section are "junkyards and refuse areas." MSB 17.60.030(A)(1).

After a public hearing, on November 27, 1989, the Planning Commission issued a resolution denying LMLC's permit application.[3] LMLC appealed this decision to the Borough Board of Adjustment and Appeals (BOAA).[4] The BOAA dismissed the appeal, finding that MSB 17.60 was a legal and binding ordinance and that it did not have jurisdiction to pass on the ordinance's constitutionality.

In December 1990, LMLC reapplied to the Planning Commission for a conditional use permit. With the exception of some minor changes, this application was substantially similar to the application which had been denied in 1989. The 1990 application was in two parts, requesting first that the Commission determine whether LMLC's proposed use required a permit under MSB 17.60. Second, if the Commission determined that MSB 17.60 was applicable, LMLC requested that the permit be granted. The Planning Commission found that MSB 17.60 was applicable and once again denied LMLC a conditional use permit.[5]

LMLC appealed this decision to the BOAA.[6] A hearing was held, and this time the BOAA reversed the Planning Commission's determination.[7] However, the BOAA determined that approval of the conditional use permit application was subject to the fulfillment of eleven conditions. These conditions were aimed primarily at ensuring that LMLC obtained the necessary state and federal permits, that there would be no groundwater contamination, and that adequate assurance was provided of LMLC's capability to finance remediation efforts in the event of inadvertent contamination.

The Borough moved for reconsideration of the BOAA decision. After a hearing on the issue, on November 6, 1991, the BOAA reversed its earlier decision and denied the conditional use permit. In its findings of fact, the Board found, *inter alia*, that LMLC had operated the landfill without fulfilling the conditions required by either the DEC permit or the BOAA's resolution. The BOAA's Notice of Decision states, "There exists no evidence, on the record, that will substantiate a finding that Lazy Mountain Land Club will operate in a manner that is not harmful to either the public welfare or health. Therefore, ... the conditional use permit can not be granted."

LMLC filed a notice of appeal to the superior court.[8] It challenged the validity of

2. This application was superseded by an amended application dated May 16, 1990.

3. MSB Planning Commission Resolution 89–124 (Nov. 27, 1989).

4. MSB 15.38.020(B) gives the BOAA jurisdiction to hear appeals from the Planning Commission on requests for a conditional use permit. Any interested party, including the applicant, may file an appeal within fifteen days of a Planning Commission decision. MSB 15.38.120.

5. MSB Planning Commission Resolution 91–23 (May 20, 1991).

6. However, LMLC apparently began using the site commercially prior to receiving the necessary permit. Both the Borough and the DEC cited LMLC for its activities at the site. On July 18, 1990, the Borough issued a stop work order after at least one truck-load of construction debris was allegedly deposited at the site without the necessary conditional use permit. Likewise, the DEC issued a notice of violation on July 27, 1990, stating that LMLC was not in compliance with its permit and prohibiting the acceptance of any more waste until the conditions of the permit were met.

7. MSB Board of Adjustment and Appeals Resolution 91–01 (Aug. 2, 1991).

8. Alaska Statute 29.40.060 and MSB 15.38.230 provide that an aggrieved party may appeal to the superior court a decision by the BOAA to grant or deny a conditional use permit. Such an appeal is "heard solely on the record established ... by the board of adjustment...." AS 29.40.060(b).

MSB 17.60 due to Mat–Su's alleged lack of a comprehensive plan, argued that MSB 17.60 was void for vagueness, and argued that MSB 17.60 was not applicable to its proposed land use. The superior court affirmed BOAA's denial of the conditional use permit, holding for the Borough on all issues except Mat–Su's claim that laches barred the suit. LMLC now appeals and Mat–Su cross-appeals.[9]

## II. *DISCUSSION*

### A. *Laches*

■ Initially, we address the Borough's argument on cross-appeal that LMLC was barred from challenging Mat–Su's comprehensive plan by laches. Laches prevents a plaintiff from bringing a claim if the defendant can show "(1) that the plaintiff has unreasonably delayed in bringing the action, and (2) that this unreasonable delay has caused undue harm or prejudice to the defendant."[10]

The superior court summarily dismissed the Borough's defense of laches. The court stated:

> The parties have thoroughly briefed the underlying issue, and resolution of the underlying issue by the courts probably will benefit the parties and the public. The court also rejects the borough's assertions that estoppel and laches should preclude consideration of the underlying issue.

■ Without addressing the merits of the Borough's argument regarding LMLC's delay, we note that we agree with the superior court that a decision on the underlying issues will benefit the parties and the public by determining the validity of the Borough's planning process. Because we resolve these issues in favor of the Borough, it was not prejudiced by the superior court's decision that laches did not bar the suit and any error would be harmless.

### B. *Was MSB 17.60 Validly Enacted?*

LMLC's primary argument is that MSB 17.60 was not validly enacted because the Borough does not have a comprehensive plan. Alternatively, LMLC argues that even if the Borough's 1970 plan could be considered a comprehensive plan, this document was adopted by resolution rather than ordinance as required by the enabling statute, and is therefore invalid. Because AS 29.40.040 would seem to require the adoption of a comprehensive development plan prior to the adoption of zoning ordinances, LMLC contends that the adoption of such an ordinance without a validly adopted plan is *ultra vires*.

#### 1. *Adoption of a comprehensive plan must precede enactment of zoning ordinances* [11]

The planning and zoning process as enacted by the Alaska Legislature is typical of most state zoning statutes. It envisions a hierarchical process in which the comprehensive plan serves as a "long-range policy guide for development of the [municipality] as a whole."[12] The plan is then implemented through zoning decisions.[13] Additionally, the existence of a comprehensive plan helps to "guard against prejudice, arbitrary decision-making, and improper motives" by providing

9. In cases where "the superior court acts as an intermediate court of appeal, no deference is given to the lower court's decision. Instead we independently scrutinize directly the merits of the administrative determination." *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987) (citations omitted).

10. *City and Borough of Juneau v. Breck*, 706 P.2d 313, 315 (Alaska 1985).

11. This question is one of statutory interpretation. Where, as here, the interpretation of a statute does not require the special expertise of the agency charged with administering the statute, this court will exercise its independent judg-

ment to determine whether the agency has complied with the statutory requirements. *Alaska Survival v. State, Dep't of Natural Resources*, 723 P.2d 1281, 1288 (Alaska 1986).

12. Donald G. Hagman, *Urban Planning and Land Development Control Law* 42 (1971).

13. *See* 1 Robert M. Anderson, *American Law of Zoning* § 5.02, at 263 (2d ed. 1976) ("The notion that zoning regulations should be imposed only in accordance with a comprehensive plan is founded on the basic premise that zoning is a means rather than an end. The legitimate function of a zoning regulation is to implement a plan for the future development of the community.").

substantive standards against which to measure individual zoning decisions.[14]

This vision of land use regulation is evident in Alaska's statutory language.[15] The requirement that the municipality adopt a comprehensive plan is found in AS 29.40.030(b), which states that "[w]ith the recommendation of the planning commission, *the assembly shall adopt* by ordinance a comprehensive plan."[16] (Emphasis added.) The statute defines a comprehensive plan as

> a compilation of policy statements, goals, standards, and maps for guiding the physical, social, and economic development, both private and public, of the first or second class borough, and may include, but is not limited to, the following:
>
> (1) statements of policies, goals and standards;
>
> (2) a land use plan;
>
> (3) a community facilities plan;
>
> (4) a transportation plan; and
>
> (5) recommendations for implementation of the comprehensive plan.

AS 29.40.030(a).

The authority to enact zoning regulations such as MSB 17.60 is found in AS 29.40.040(a), which states:

> *In accordance with a comprehensive plan* adopted under AS 29.40.030 *and in order to implement the plan,* the assembly by ordinance shall adopt ... provisions governing the use and occupancy of land that may include, but are not limited to
>
> . . . .

(2) land use permit requirements designed to encourage or discourage specified uses ... or to minimize unfavorable effects of uses....

(Emphasis added.) LMLC cites numerous cases in which other state courts interpreted similar statutory language and found that "the adoption of a comprehensive development plan is a necessary prerequisite ... for the adoption of county zoning regulations."[17]

' This court has endorsed this view of the relative roles of planning and individual land use decisions in a separate but analogous context—public land management. In *Alaska Survival v. State, Department of Natural Resources*,[18] we invalidated the classification and disposal of public land for agricultural homesteading because the decision to dispose of the land had preceded the adoption of a regional plan. As we stated in *Alaska Survival*:

> To interpret these provisions to allow classification and disposal before regional planning defies logic. It makes little sense to require comprehensive regional planning after the relevant land use decisions already have been made....[19]

Mat–Su is correct in pointing out that the public lands planning requirement in AS 38.04.065 is more specific than the municipal planning requirement in reference to the substantive standards which the planners should apply.[20] However, this in no way alters the "logic" of requiring planning to precede the individual land use decisions.

■■■ We therefore hold: (1) that the plain language of AS 29.40.030(b) is mandato-

---

**14.** *South Anchorage Concerned Coalition, Inc. v. Coffey,* 862 P.2d 168, 174 (Alaska 1993); *see also Roseta v. County of Washington,* 254 Or. 161, 458 P.2d 405, 409 (1969) ("[M]any of the evils in zoning practice can be ameliorated by a judicial insistence upon the zoning board's compliance with the statutory requirement that any changes in the zoning ordinance be made 'in accordance with a comprehensive plan.'").

**15.** When the words of a statute are clear and unambiguous, their plain meaning will be given effect. *See White v. Alaska Ins. Guar. Ass'n,* 592 P.2d 367, 369 (Alaska 1979).

**16.** Additionally AS 29.35.180(a) requires that "[a] first or second class borough shall provide

for planning, platting, and land use regulation in accordance with AS 29.40."

**17.** *Allen v. Flathead County,* 184 Mont. 58, 601 P.2d 399, 401 (1979); *see also Creative Displays, Inc. v. City of Florence,* 602 S.W.2d 682 (Ky. 1980); *Smith v. Skagit County,* 75 Wash.2d 715, 453 P.2d 832 (1969).

**18.** 723 P.2d 1281 (Alaska 1986).

**19.** *Id.* at 1289.

**20.** AS 38.04.065(b) lists eight substantive criteria which the Commissioner of Natural Resources should consider in adopting regional and sitespecific land use plans.

ry and requires that the municipality adopt a comprehensive plan;[21] (2) that AS 29.40.040 requires that the plan be adopted prior to zoning regulations; and (3) where zoning is enacted prior to the adoption of a comprehensive plan, these statutory sections require that a legal remedy be imposed.[22]

### 2. Mat–Su's comprehensive plan [23]

 LMLC's next argument challenging the validity of the Borough's planning process is that the document entitled "The Matanuska–Susitna Borough Comprehensive Development Plan," adopted by resolution in 1970 (the 1970 plan), along with the other documents which Mat–Su offered as evidence, do not constitute a "comprehensive" plan as required by AS 29.40.030(a).

 Mat–Su argues that "[t]he 1970 comprehensive plan is but one element of the plan that, along with the other documents drafted by Mat–Su, encompass the elements of Mat–Su's comprehensive planning process." "The other documents" referred to by Mat–Su are catalogued in an affidavit by John Duffy, the Borough Planning Director. These include comprehensive transportation and public facilities plans,[24] city plans for Houston,[25] Palmer,[26] and Wasilla,[27] as well as numerous other area and facilities plans.

LMLC argues that a "comprehensive plan" must be of "wide scope." It states that the presence of city plans does not diminish the obligation of the Borough to adopt a single area-wide plan which covers the entire municipality. Without such a plan in place there is no guarantee that city plans will not conflict with each other. Finally, LMLC argues that the single most important part of

21. The superior court held without explanation, that the language in AS 29.40.030–040 is directory rather than mandatory. The Borough also makes this argument relying on *City of Yakutat v. Ryman*, 654 P.2d 785 (Alaska 1982), where this court held that a state statute establishing a time by which municipalities were to issue their tax assessments was directory and therefore did not bar a "late" assessment. The court considered three factors in determining that the statute was directory rather than mandatory: (1) that the statutory wording was affirmative rather than prohibitive; (2) that the legislative intent was to create "guidelines for the orderly conduct of public business;" and (3) that serious, practical consequences would follow from a finding that the statute was mandatory. *Id.* at 789–91.

Although the statutory command at issue in the present case is an affirmative one, we believe AS 29.40.030 is mandatory. First, the Borough has provided no evidence of any legislative intent that this statute was meant to be directory. Second, "[t]he procedural steps required by the state zoning enabling statutes usually are regarded as mandatory." 1 Robert M. Anderson, *American Law of Zoning* § 4.03, at 185 (1976).

22. We do not hold that all zoning decisions made in the past that were made prior to the adoption of a comprehensive plan are invalid. For example, where the municipality has subsequently adopted a comprehensive plan, and the preexisting zoning ordinance rationally complies with that plan, the landowner is not prejudiced and any defect is cured. However, where a municipality attempts to enact zoning regulations presently in the absence of a validly enacted comprehensive plan, the action is unlawful. We need not reach the question of what remedy or remedies might be appropriate in such a case.

23. This issue presents a mixed question of law and fact. First, this court must answer the legal question of what constitutes a sufficient comprehensive plan under AS 29.40.030. We must then address the factual issue of whether or not Mat–Su's plan comports with this standard. In addressing the first question we apply the reasonable basis standard of review. The legal question of what comprises a sufficient comprehensive plan requires an evaluation of the specific planning needs of the municipality. This judgment is within the sphere of expertise of the Planning Commission and the BOAA and therefore is entitled to considerable deference. *South Anchorage Concerned Coalition*, 862 P.2d at 168 n. 12; *see also infra* notes 67–69 and accompanying text (discussing why reasonable basis review is appropriate for Planning Commission decisions).

As to our review of the BOAA's factual findings, we apply the substantial evidence test. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fields v. Kodiak City Council*, 628 P.2d 927, 932 (Alaska 1981).

24. These were both enacted by ordinance. MSB Ordinance No. 85–4 (Feb. 5, 1985); MSB Ordinance No. 84–61 (July 3, 1984).

25. City planning is accomplished via a cooperative effort between Mat–Su and the respective city with the final comprehensive plan approved by the Mat–Su Borough Assembly. The City of Houston plan was adopted by MSB Ordinance No. 81–151 (June 1, 1982).

26. MSB Ordinance No. 88–012 (Feb. 16, 1988).

27. MSB Ordinance No. 86–015 (March 4, 1986).

the plan, the borough-wide land use plan, was never adopted by ordinance.

As discussed above, AS 29.40.030(a), which defines "comprehensive plan," states that the plan "may include, but is not limited to," numerous different elements including, *inter alia*, a statement of policies, a land use plan, and a community facilities plan. Thus, while the Borough is required to adopt a plan, the statute leaves it within the Borough's discretion what elements to include within that plan. This allows planners to fashion the plan to the needs of the community, which in turn will be affected by such factors as population density, topography, and the local economy. In light of these factors, it may make sense, and would be statutorily permissible, to engage in more detailed land use planning of population centers in the borough, while limiting the planning efforts with regard to the entire borough to a statement of policies.[28]

Nor does the fact that the various elements of the plan were adopted in a piecemeal fashion affect our determination as to whether, as a whole, they comprise a comprehensive plan.[29] While Alaska's statute is silent on this issue, the Standard City Planning Enabling Act, as well as the planning acts of California, Illinois, New Jersey, and Connecticut, all explicitly authorize piecemeal adoption of the comprehensive plan.[30] Such an approach recognizes the limited budgets of municipal entities, the ongoing nature of the planning process, and the fact that in certain instances different elements of the plan are dependent on each other and there-fore that sequential enactment might be desirable.[31]

In light of the broad discretion left to the municipality in the composition of the plan and the substantial evidence in the record regarding the Borough's planning efforts, we hold that Mat–Su has satisfied the requirement that it enact a comprehensive plan.

### 3. *The enactment of Mat–Su's comprehensive plan*[32]

LMLC's final argument regarding the planning process is that the Borough failed to adopt by ordinance the 1970 plan and some of the other documents which it claims comprise the plan. Because the enactment of an ordinance allows the public an opportunity for notice and comment, LMLC contends that the Borough may not rely on "resolutions" to adopt its comprehensive plan.

Alaska Statute 29.25.010 requires that certain acts by a municipality must be done by ordinance.[33] Among those acts which are enumerated is the adoption, modification or repeal of a municipality's comprehensive plan.[34] Alaska Statute 29.25.020 provides detailed procedural requirements which must be followed in the adoption of an ordinance. These include, *inter alia*, that the ordinance be introduced in writing,[35] that notice of the proposed ordinance be published,[36] and that a public hearing be held before its adoption at which all interested persons may speak.[37] Because it must be enacted as an ordinance, the adoption of a comprehensive plan must

**28.** This illustration is meant to show an example of what is sufficient under the statute, not what is necessary. The determination of whether a borough's plan is "comprehensive" is a factual one and therefore requires an examination of the individual facts and circumstances in each case.

**29.** *See generally* 3 Robert M. Anderson, *American Law of Zoning* § 21.11, at 601–02 (2d ed. 1977).

**30.** *Id.*

**31.** For example, the decision to encourage residential development in a particular area of the municipality may affect the placement of public facilities or the development of a specific type of transportation system.

**32.** This is a question of law which lies squarely within the sphere of judicial competence. In such a case, courts do not defer to an agency's interpretation, but instead apply their own "independent judgment." *Kjarstad v. State*, 703 P.2d 1167, 1170 (Alaska 1985).

**33.** AS 29.25.010(b) specifically states that "[t]his section does not grant authority, but requires the governing body to use ordinances in exercising certain of its powers."

**34.** AS 29.25.010(a)(6).

**35.** AS 29.25.020(a).

**36.** AS 29.25.020(b)(3).

**37.** AS 29.25.020(b)(2), (5).

satisfy all of the procedural requirements listed in AS 29.25.020.

Mat–Su makes two arguments as to why the court should uphold the validity of the 1970 plan despite the fact it was never adopted as an ordinance. First, it argues that there is a presumption of validity as to all municipal actions and that the burden of proving otherwise is on the person trying to show their invalidity. Because LMLC has not provided any evidence that notice and hearings were not held on the 1970 plan, the court must presume it was validly enacted.

The Borough relies heavily on *Liberati v. Bristol Bay Borough* [38] for this argument. In *Liberati*, this court applied the presumption of validity and concluded that a public hearing that was noticed was actually held, and therefore that the challenged ordinance was validly enacted. In contrast, in the present case the Borough is trying to use this presumption to metamorphize a resolution into an ordinance. Professor McQuillin notes that the enactment of a resolution generally does not require the same formal procedures which are required to enact an ordinance. Therefore, "a municipal corporation cannot accomplish by resolution ... that which, under its charter, it can do only by an ordinance." [39] This distinction is evident in our statutes. The procedural requirements for enacting an ordinance are detailed *supra*. The only requirement with regard to resolutions, on the other hand, is that the governing body maintain a permanent file of all resolutions which have been adopted. [40] In light of the fact that the 1970 plan was adopted as a resolution rather than an ordi-

nance, and that the Borough presented no evidence that a hearing was held, there is no reason to believe that the requirements of AS 29.25.020 have been met.

Mat–Su's second argument is that, even assuming that no hearing was held, it "substantially complied" with the requirement that it enact a comprehensive plan. Therefore the act should not be voided due to a minor procedural irregularity. We reject this argument as well. In *State v. First National Bank of Anchorage*, [41] the principle case on which Mat–Su relies, the appellant challenged the adequacy of the notice of a proposed regulation. We rejected the appellant's claim because the contents of the notice "gave members of the public sufficient information to decide whether their interests could be affected by the agency action." [42] Similarly, in other jurisdictions where the enactment of zoning ordinances was upheld under a theory of "substantial compliance," the procedural irregularities can all be characterized as minor. [43] Where, on the other hand, there is no opportunity for public comment on the plan before enactment because of a failure to hold public hearings, the Borough has not substantially complied with the requirement that it enact the plan by ordinance. [44]

Nonetheless, we believe the 1970 plan was validly enacted when it was incorporated by reference into a later borough ordinance. [45] MSB 15.24.030(B) states that "[t]he following comprehensive plans have been adopted by the borough planning commission and the assembly as instruments of borough policy: (1) Matanuska–Susitna Borough Comprehensive Development Plan, adopted

---

**38.** 584 P.2d 1115 (Alaska 1978).

**39.** 5 Eugene McQuillin, *McQuillin Municipal Corporations* § 15.02, at 56 (3d ed. 1989); *see also International Ass'n of Firefighters Local 1596 v. City of Lawrence*, 14 Kan.App.2d 788, 798 P.2d 960, 966 (1990).

**40.** AS 29.25.060(a).

**41.** 660 P.2d 406 (Alaska 1982).

**42.** *Id.* at 425.

**43.** *See, e.g., Jarvis Acres, Inc. v. Zoning Comm'n of E. Hartford*, 163 Conn. 41, 301 A.2d 244

(1972) (notice was adequate when published in two different newspapers when statute required publication in a single newspaper on two different days); *Northern Operating Corp. v. Town of Ramapo*, 26 N.Y.2d 404, 311 N.Y.S.2d 286, 259 N.E.2d 723 (1970).

**44.** *See Creative Displays, Inc. v. City of Florence*, 602 S.W.2d 682 (Ky.1980).

**45.** Although this argument was not raised by the Borough, "[t]his court ... may affirm a judgment of the superior court on different grounds than those advanced by the superior court and even on grounds not raised by the parties in the superior court." *Native Village of Eyak v. GC Contractors*, 658 P.2d 756, 759 (Alaska 1983).

1970, as amended...." This section was adopted by ordinance after a public hearing.[46]

Generally, "the adoption by reference of documents in municipal ordinances is valid where the document adopted is sufficiently identified and is made part of the public record."[47] In *Raymond v. Baehr*,[48] the Minnesota Supreme Court upheld the enactment by reference of a building code despite the fact that the code itself was not published as required by state law. In determining that the code qualified as a public record the Minnesota Supreme Court noted:

> While the exact procedure followed by the city council in adopting the code is not clear, it appears ... that the code was drawn by the city engineer and a committee of the council, read to the entire body, and apparently approved. These actions appear to us to be sufficient to qualify it as a public record.[49]

Similarly, the 1970 plan qualifies as a public record. It was drawn up by the Borough Planning Department and was adopted as a resolution by the Borough Assembly. Because the borough's citizens had an opportunity for comment at a public hearing when MSB 15.24.030(B) was enacted in 1991, we hold that the 1970 plan was adopted by ordinance as required by AS 29.25.010(a)(6).

### C. Due Process [50]

LMLC's next claim is that even assuming it was validly enacted, the definition for "junkyard/refuse area" in MSB 17.60.010(F) is unconstitutionally vague. This section defines a "junkyard/refuse area" as

> a location which is commercially used for the purpose of the outdoor storage, handling, dismantling, wrecking, keeping or sale of used, discarded, wrecked or abandoned airplanes, appliances, vehicles, boats, building and building materials, machinery, equipment, or parts thereof, including but not limited to, scrap metals, wood, lumber, plastic, fiber or other tangible materials.

MSB 17.60.010(F). LMLC argues that this definition encompasses such a wide range of potential land uses that many landowners would be unable to determine whether or not the zoning ordinance applied to them.[51] To show that the statute has been arbitrarily applied, LMLC points out that no conditional use permit was required for the municipal landfill, a use seemingly indistinguishable from LMLC's proposal.

The United States Supreme Court long ago recognized, "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."[52]

First amendment concerns aside,[53] the U.S. Supreme Court has identified two im-

**46.** MSB Ordinance 91–078, § 3 (Aug. 6, 1991). The ordinance states that a public hearing on this ordinance was held on August 6, 1991.

**47.** 5 Eugene McQuillin, *McQuillin Municipal Corporations* § 16.12, at 194 (3d ed. 1989).

**48.** 282 Minn. 109, 163 N.W.2d 51 (1968).

**49.** *Id.* 163 N.W.2d at 53; *see also Friedman v. Goodman,* 219 Ga. 152, 132 S.E.2d 60, 66 (1963) (court upheld the adoption of a document in a municipal ordinance by incorporation by reference where the incorporated record was adequately identified, accessible to members of the public, and the adopting ordinance gave notice of this accessibility).

**50.** This court reviews constitutional issues *de novo* and applies its independent judgment. *Arco Alaska, Inc. v. State,* 824 P.2d 708, 710 (Alaska 1992). We will adopt "the rule of law most persuasive in light of precedent, reason, and policy." *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**51.** LMLC cites a 1985 statement by the then Chairman of the BOAA arguing that the ordinance applies to "every commercial use in this Borough. Every gas station in this Borough outside of a city, every airplane hangar, that's every shop, every prefab place, every appliance sales place."

**52.** *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) (*quoted in State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 531 n. 37 (Alaska 1980)).

**53.** When a vague law reaches activity protected by the first amendment, in addition to the due process concerns discussed below, there is a concern that the law will unnecessarily "chill"

portant due process values which are offended when a law is unconstitutionally vague:

First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.... Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.[54]

■ In adopting this analytical framework, this court stated that it will examine "three principal considerations in determining whether a statute is unconstitutionally vague."[55] The first, whether the statute "operate[s] to inhibit the exercise of first amendment rights,"[56] is not applicable to the present case. However, the second, whether the statute gives adequate notice of what conduct is prohibited, and the third, whether there "has been a history or a strong likelihood of uneven application,"[57] are applicable.

■ Additionally, the U.S. Supreme Court determined in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*[58] that a lower degree of exactitude is required for civil as opposed to criminal statutes. Justice Marshall wrote for the court:

The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test be-

cause its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. *Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.* The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.[59]

In accordance with this view, we have stated that with respect to civil statutes, "[a]ll that should be required is legislative language which is not so conflicting and confused that it cannot be given meaning in the adjudication process."[60]

■ Applying these principles to the present case, we conclude that MSB 17.60 is not void for vagueness. First, as to the notice consideration, even a cursory reading of MSB 17.60 makes it clear that the ordinance is applicable to LMLC's proposed use. In its permit application, LMLC indicated that seventy percent of its waste would be demolition waste including building debris and non-metallic residue from auto salvaging operations. LMLC would also engage in the dismantling of mobile homes at the site. This fits squarely within the definition of a junkyard under MSB 17.60.010(F) as a "location ... used for the purpose of outdoor storage, *handling, dismantling,* wrecking, keeping or sale of used, *discarded, wrecked* or abandoned ... *vehicles,* boats, building and *building materials....*" (Emphasis added.) Additionally, the definition of "junk" in MSB 17.60.010(E) includes *"wrecked auto-*

first amendment rights. *See* Laurence Tribe, *American Constitutional Law* § 12–31, at 1033–35 (2d ed. 1988) (discussing the distinction between these two lines of cases).

54. *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (footnotes omitted).

55. *O'Neill,* 609 P.2d at 531; *see also Levshakoff v. State,* 565 P.2d 504, 507–08 (Alaska 1977); *Stock v. State,* 526 P.2d 3, 7–8 (Alaska 1974).

56. *O'Neill,* 609 P.2d at 531.

57. *Stock,* 526 P.2d at 8.

58. 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

59. *Id.* at 498–99, 102 S.Ct. at 1193 (emphasis added) (footnotes omitted) (*quoted in Storrs v. State Medical Bd.,* 664 P.2d 547, 549 (Alaska 1983)).

60. *Williams v. State, Dep't of Revenue,* 895 P.2d 99, 105 (Alaska 1995).

*mobiles,* tools, implements, rags, *used building materials,* rubber and paper." (Emphasis added.) Finally, in accordance with the U.S. Supreme Court's decision in *Hoffman Estates,* because this statute was economic regulation, and because LMLC could, and did, avail itself of the administrative process to clarify the statute's applicability, it is clear that LMLC had sufficient notice.[61]

LMLC's primary contention with regard to vagueness is that MSB 17.60 has been arbitrarily enforced. With regard to this final consideration, this court has stated that it "will not invalidate a statute on vagueness grounds absent evidence of a history of arbitrary or capricious enforcement." [62] In other words, the court will not engage in speculation to find instances where the statute might be arbitrarily applied. Instead it will look to see if there has been a history of arbitrary enforcement or if the language of the statute is "so conflicting and confused" [63] that arbitrary enforcement is inevitable.

LMLC fails to make such a showing in this case. LMLC provides no evidence that there are other private landfills or other similar land uses which the Borough has not required to obtain a conditional use permit. Nor is the Borough's failure to require a permit for its public landfill evidence of arbitrary enforcement, because, as discussed in the next section, MSB 17.60 only applies to "commercial" junkyards and refuse areas. Because none of the considerations suggests that MSB 17.60 is vague, we conclude that the ordinance is constitutional.

### D. *MSB 17.60's Applicability to LMLC's Proposed Land Use*

LMLC's final contention is that MSB 17.60 is not applicable to its proposed land use and therefore that no conditional use permit is required. LMLC argues that the ordinance by its own terms applies only to salvage operations and not to landfills where discarded materials are buried.[64] In support of this argument LMLC points to the fact that no conditional use permit was required for the municipal landfill, a use "virtually indistinguishable from" LMLC's proposed use.[65]

Whether the municipal landfill is required to obtain a conditional use permit depends on whether this use falls within the definition of "junkyard/refuse area" in MSB 17.60.010(F). Because the definition includes only "commercial" locations, the answer turns on the question of whether or not the city landfill is a commercial enterprise.[66]

---

**61.** In addition to civil penalties, MSB 17.60 does provide for criminal penalties of up to $500 and 30 days in jail for each offense. However, the primary enforcement mechanism is the enforcement order which requires the land owner to cease and desist from all activities contrary to terms of the order. MSB 17.60.210.

**62.** *Summers v. Anchorage,* 589 P.2d 863, 869 (Alaska 1979) (quoting *Levshakoff,* 565 P.2d at 507).

**63.** *Williams,* 895 P.2d at 105.

**64.** LMLC also argues that because zoning ordinances are in derogation of common-law property rights, the court should strictly construe MSB 17.60 in favor of the property owner. Mat–Su correctly points out that this court rejected this minority rule in *City and Borough of Juneau v. Thibodeau,* 595 P.2d 626, 635 n. 31 (Alaska 1979). Instead, the court adopted the majority rule that "in construing zoning ordinances, the same rules of construction are used as when the courts are construing statutes of the legislature." *Id.*

**65.** LMLC correctly notes, "In interpreting a zoning ordinance, the trial court may consider the contemporaneous construction of that ordinance by the public officials charged with its administration." *Corper v. City and County of Denver,* 36 Colo.App. 118, 536 P.2d 874, 879 (1975), *aff'd,* 191 Colo. 252, 552 P.2d 13 (Colo.1976). This is a specific application of a general rule that an agency's contemporaneous administrative construction is a valuable aid, but not conclusive, in determining the meaning of a statute. *Wien Air Alaska, Inc. v. Dep't of Revenue,* 647 P.2d 1087, 1090 (Alaska 1982).

**66.** Alternatively, the Borough argues that because the municipal landfill was in existence as of the date of enactment of the conditional use ordinance, under MSB 17.60.200 its use would be "grandfathered" as a nonconforming use. LMLC correctly points out in its reply brief that under the ordinance's "existing nonconforming use" provision, MSB 17.60.200(C) requires that the owner of the property apply for a permit within 180 days of the ordinance's enactment. Thus, even if the Borough would have been entitled to such a permit, its failure to procure one would put it in violation of MSB 17.60 if this ordinance applies.

■ Resolution of this dispute requires the interpretation and application of MSB 17.60. This court has stated that "[w]hen a planning agency does, in fact, provide its interpretation of an ordinance within its area of expertise, we will give that interpretation considerable deference."[67] Although we have not previously defined precisely what standard of review we will use in such cases, we believe that application of the "reasonable basis" test is appropriate.[68] Under this test, the court "need not find that [the Commission's] construction is the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings."[69]

■ Applying this standard, we conclude that the Planning Commission could reasonably find that the municipal landfill was not "commercial" and therefore that no permit was required.[70] Such an exception is justified because the operation of the borough landfill is regulated under other sections of the borough code.[71] Additionally, the underlying purpose of the conditional use permit requirement is to allow the Planning Commission to make a case by case determination about the appropriateness of placing a noxious use in a particular area, as well as the necessity of imposing particular conditions in order to mitigate the impact on neighboring property.[72] Because the Planning Commission can use other planning devices to ensure the appropriate siting of a municipal landfill, and can recommend measures be adopted to regulate the landfill's operation,[73] the Commission could reasonably conclude that private and public facilities should be treated differently. Thus, there is no evidence that there is a conflicting contemporaneous construction of the statute by the Planning Commission. In light of the fact that the definition for junkyard in MSB 17.60 clearly encompasses LMLC's proposed land use, we hold that the Commission could reasonably find that MSB 17.60 applies to LMLC's proposed land use and therefore that a conditional use permit is required.

## III. CONCLUSION

We conclude that the language in AS 29.40.040 requiring that zoning regulations be enacted "in accordance with" or "in order to implement" the comprehensive plan, requires that the Borough's zoning regulations must be consistent with a validly enacted plan. The Borough has satisfied this requirement because the various documents which the Borough Assembly has adopted by ordinance together with the 1970 plan which was enacted by reference comprise a valid comprehensive plan. MSB 17.60 is not void

67. South Anchorage Coalition, 862 P.2d at 173 n. 12.

68. In explaining why an agency's interpretation of its own regulation is entitled to great deference, this court has

noted that the deferential "reasonable basis" standard of review is appropriate where a question of law implicates the agency's expertise as to complex matters or as to the formulation of fundamental policy.... [W]here an agency interprets its own regulation ... a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue.

Rose v. Commercial Fisheries Entry Comm'n, 647 P.2d 154, 161 (Alaska 1982) (citations omitted). Arguably, the same deference should not be given to a Planning Commission because the regulations being interpreted are enacted by the municipality's council rather than the planning Commission. AS 29.40.040. However, the Commission and the BOAA are the municipal bodies primarily responsible for planning and zoning efforts. AS 29.40.020(b) (charging the Planning Commission with the responsibility for recommending and administering both the comprehensive plan and zoning regulations). In light of the Commission's and BOAA's roles in the planning process, and the expertise they develop in administering the municipality's zoning ordinances, deference equal to that accorded to an administrative agency is appropriate.

69. Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946) (quoted in Pan American Petroleum Corp. v. Shell Oil Co., 455 P.2d 12, 22 (Alaska 1969)).

70. "Commercial" is defined in MSB 17.60.010(C) as "any activity where goods or services are offered or provided for sale or profit."

71. See MSB 8.04.

72. See 6 Patrick J. Rohan, Zoning and Land Use Controls § 44.01[4] (1993).

73. AS 29.40.020(b)(2).

for vagueness and therefore does not violate LMLC's right to due process of law. Finally, the BOAA could rationally have found that MSB 17.60 applies to LMLC's proposed use and therefore that a conditional use permit is required.

We therefore AFFIRM the superior court's decision.